**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **SUSANTY ROBERTS,** | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. _____ |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **TIMLESS FUNDING, LLC** | § | |
| *Defendant.* | § | |

---

**PLAINTIFFS' ORIGINAL COMPLAINT**

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

**COME NOW**, Plaintiff, **SUSANTY ROBERTS,** and submit this Original Complaint, complaining of Defendant, **TIMELESS FUNDING, LLC** (hereinafter, "TLF") and for cause of action hereunder would respectfully show unto this Honorable Court as follows:

**PARTIES**

1. Plaintiff, **SUSANTY ROBERTS** is an individual residing in the State of Texas in the Houston Division of the Southern District of Texas.

2. Defendant, **TIMELESS FUNDING LLC** is a limited liability company organized in and pursuant to the laws of the State of New York, and maintaining its principal business office at 5014 16th Avenue, Suite 124, Brooklyn, New York, 11219. Defendant engages in business in the State of Texas by providing funding to business concerns operating in Texas. Service may be had on Defendant **TIMELESS FUNDING LLC** through the Secretary of State of Texas by delivery to its registered agent, **USACORP, INC.** at its offices located at **266 Broadway, Suite 401, Brooklyn, New York, 11211.**

**JURISDICTION**

3.       This Court has jurisdiction based on diversity of citizenship of the parties under 28 U.S.C. § 1332, as all Plaintiffs are residents of different states than Defendant (28 U.S.C. § 1332(a)(1)) and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs (28 U.S.C. § 1332(a)).

4.       This Court also possesses subject-matter jurisdiction pursuant to 28 U.S.C. § 2201 ("Declaratory Judgment Act") as Plaintiffs seek a declaration of the rights and obligations of the parties under the Merchant Cash Advance Agreement ("MCA") between the parties.

## VENUE

5.       Venue is proper in the Southern District of Texas, Houston Division pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff operates its business enterprise that is the subject of this dispute in this District and Division, and is a therefore a judicial district in which a substantial part of the events giving rise to Plaintiff's claim occurred.

## FACTS

6.       This matter involves a "Merchant Cash Advance" Agreement ("MCA") between Roberts Chevrolet GMC Inc. d/b/a Roberts Chevrolet GMC (hereinafter, "Roberts Chevrolet"), owned by Plaintiff, Susanty Roberts and Defendant, to which Plaintiff Roberts is a personal guarantor. A copy of the MCA is attached hereto as Exhibit "A."

7.       Plaintiff is the guarantor on the applicable MCA.

8.        "Merchant Cash Agreements" have been the subject of widespread litigation throughout the United States, as many unscrupulous companies disguise usurious loan agreements as *bona fide* MCAs. Such agreements have been deemed predatory and usurious in numerous jurisdictions.

2

9.      Defendant TLF fraudulently represented to Plaintiff that it was entering into a "cash advance agreement" pursuant to a Standard Merchant Cash Advance Agreement (the "MCA") executed on or about July 24, 2025 between Defendant and Plaintiff's principal, Susanty Roberts. Pursuant to the terms of the MCA, Roberts Chevrolet would be paid the sum of $285,000 in exchange for a pledge of $449,700.00 in future receivables from Roberts Chevrolet.

10.     Per the terms of the MCA, Roberts Chevrolet was obligated to make a payment to TLF of $8,994.00 *per day*, a figure which TLF asserted represented the "approximation of no more than the Specified Percentage of the Receivables" (identified as 25% in the MCA). In actuality, this daily figure represented the minimum payment Roberts Chevrolet was obliged to pay TLF in order to repay the "Receivables Purchased Amount" of $449,700.00.

11.     As the Court can see, payment of $8,994.00 per day would result in payment of the $449,700.00 in "receivables purchased" in fifty (50) days.

12.     Though presented as a "prepurchase" of Plaintiff, Roberts Cheverolet's future receivables, it is now clear to Plaintiffs that this transaction was nothing more than a loan, featuring exceedingly unfavorable terms. Under the terms of the MCA, Roberts Chevrolet was paid $285,000 (the loan amount) and obligated to pay TLF a minimum of $8,994.00 per day until Roberts Chevrolet had repaid TLF the total sum of $449,700.00 *fifty days later*. This represents a repayment of principal of $300,000 with interest totaling $149,700.00 over only fifty days; put another way, this works out to 50% interest in fifty days, reflecting an APR of *365%*.

13.     No doubt wary of triggering usury laws prohibiting such predatory practices, TLF included the following language at page 4 of the MCA:

> **15. Sale of Receivables.** Each Merchant [Roberts Chevrolet] and TLF agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from TLF to any Merchant. TLF is entering into this Agreement knowing the risks that each Merchant's business may decline

or fail, resulting in TLF not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. TLF has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to TLF in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

Exhibit A at p. 4 (emphasis added)

14.     Though the foregoing language, at first review, seems to suggest that the MCA is, as the provision provides, not a loan but rather a current value purchase of the future value of receivables, comparison of this language with the rest of the MCA belies the agreement's true intent. For example, TLF asserts that it is "entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in TLF not receiving the Receivables Purchased Amount," suggesting that TLF is simply making an investment for which, like any investment, returns are not guaranteed. However, language throughout the remainder of the agreement belie that the MCA is anything but an investment.

15.     For example, TLF required Roberts Chevrolet to appoint TLF "as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to TLK" including to secure payments "in an Event of Default." (Exhibit A at ¶ 16). The mere fact that the MCA devotes so many terms to potential "Default" is, itself, compelling evidence that this transaction truly was a *loan*, rather a *purchase.*

16.     More telling than the frequent reference to potential "default" throughout the MCA is the fact that TLK required Roberts Chevrolet to secure this "purchase transaction" with a **guarantor.** Plaintiff Roberts was required to execute the "Personal Guarantee of Performance" guaranteeing that Roberts Chevrolet will fulfill its obligations and, essentially, repay the loan – or

4

rather, "purchased receivables" – should Roberts Chevrolet fail to do so. This provision and separate guarantee agreement runs in direct contravention to any reasonable expectation that TLF might face the prospect of "not receiving the 'Receivables Purchased Amount'" in the event that Roberts Chevrolet's business declined (or failed).

**CAUSES OF ACTION**

## A.  Fraud / Fraudulent Inducement.

17.    Notwithstanding the overt representations to the contrary, it is clear that the MCA is, in fact, a loan. Despite being actually aware of its intentions to treat the MCA as a de facto loan, TLF nevertheless made numerous false representations regarding the nature of the transaction which were designed to circumvent consumer and small business protection laws, prey on Plaintiffs' vulnerability as a small business facing tight economic conditions, and cause Plaintiffs to enter into the MCA with the expectation that the transaction would be treated as an investment rather than as a loan.

18.    The language of the MCA is deliberately vague and surreptitious, and is phrased and structured as such for the sole, express purpose of misleading, misinforming, and misrepresenting the true nature of the transaction in order to entrap unsuspecting small business borrowers like Plaintiffs. TLF's actions have shown that the MCA is, in fact and in law, a non-recourse, non-contingency, repayable loan featuring fees and interest rates that grossly exceed the usury statutes of Texas and other jurisdictions.

19.    Plaintiff, as guarantor, relied on the misrepresentations of TLF, both contained in and tendered for the express purposed of inducing Plaintiff into entering into the MCA. As a direct and proximate result of its reliance on TLF's intentional misrepresentations, Plaintiff suffers damages.

5

**B.  Breach of Fiduciary Duty**

20.  By its express terms, the MCA appoints TLF as Roberts Chevrolet's "agent and attorney-in fact" but then grants to TLF the right to "take any action or execute any instrument or document to settle all obligations due to TLF" even if TLF merely "considers an Event of Default to have taken place" so as to allow TLF to simply collect funds to "settle all *obligations* due to TLF" including (a) obtaining insurance; (b) collecting monies due or which become due in respect of any of the Collateral; (c) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper; (d) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to TLF; and (e) to file any claims or take any action or institute any proceeding which TLF may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

21.  An agent and/or attorney-in-fact owes a fiduciary duty to its principal.[1] The MCA ostensibly creates an agency or power of attorney relationship between TLF and Roberts Chevrolet (Exhibit A, ¶ 16), but by its very language makes it clear that TLF's intends to disregard any fiduciary obligations in exercising is agency / attorney-in-fact powers, as it states it will use such power to collect monies due to it, receive and endorse checks, sign Roberts Chevrolet's name to invoices or assignments directing customers or account debtors to make payment *directly to TLF* (Exhibit A, ¶ 16) (emphasis added). Resultantly, Ms. Roberts as guarantor has standing to enforce the agency relationship as a matter of law.

---

[1]  *National Plan Adm'rs, Inc. v. National Health Ins.*, 235 S.W.3d 695, 700 (Tex. 2007); *Healey v. Healey*, 529 S.W.3d 124, 137 (Tex. App. – Tyler 2017, pet. denied) (a power of attorney creates an agency relationship, which is a fiduciary relationship as a matter of law).

**DECLARATORY RELIEF**

22.     Plaintiff seeks a declaration of the rights, obligations, and enforceability of various provisions of the MCA pursuant to 28 U.S.C. § 2201 ("Declaratory Judgment Act").

**C.  MCA is a loan agreement in disguise.**

23.     Plaintiff seeks a declaration that the MCA is, in fact, a "disguised loan" rather than a true sale-of-future-receivables agreement.

24.     In a true sale of future receivables, the "buyer" actually bears the risk that the purchased asset will be uncollectible. However, agreements styled as "merchant cash advances" or "receivables purchases" actually may be loans if they impose an absolute obligation to repay and shift virtually all risk to the "seller" (or borrower) of the future receivables.

25.     When determining whether the right to repayment is absolute, courts must weigh three factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." In addition, courts may consider whether there are default provisions entitling the lender to immediate repayment, and whether the agreement allows collection on a personal guaranty in the event of default or bankruptcy.

26.     In this matter, in looking at the substance of the MCA, there are several aspects that indicate it is a loan. TLF does not actually bear any risk under the MCA because TLF retained the ability to sweep 100% of Roberts Chevrolet's income via ACH, establishing that TLF has control over the funds and is effectively requiring full repayment regardless of Roberts Chevrolet's business performance. Additionally, the MCA required that the Plaintiff Susanty Roberts, owner of Roberts Chevrolet, agree to personally guarantee the debt, offering TLF an additional method

to recover even if Roberts Chevrolet defaults, which shows that TLF (the actual lender), is not bearing the risk of the MCA. These features are hallmarks of a disguised loan rather than a true sale of future receivables.

27.     The MCA is presented as a "merchant cash advance" agreement, by which the Plaintiff is "selling" its future receivables for a sum certain at present. However, as the face of the Agreement clearly demonstrates, this transaction was, in fact, a loan. Specifically, TLF agreed to "purchase" the total sum of $449,700.00 in "receivables" for the "purchase price" of $300,000.00; however, the "net funds" for the purchase totaled only $285,000 because TLF charged Plaintiff $15,000 to cover "underwriting and the ACH debit program."

28.     Moreover, despite the agreement ostensibly being an arms-length purchase agreement whereby TLF was purchasing future amounts of receivables for a fixed price payable to Plaintiff Rogers Chevrolet, the transaction inexplicably required a "guarantor" as a "guaranty of performance." (See Exhibit A, ¶ G.1) This performance guaranty is necessary notwithstanding the language of ¶ 15 of the Agreement whereby TLF provides that it "is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in TLF not receiving the Receivables Purchased Amount." This language was included purely to mislead Plaintiffs into executing the Agreement and Guarantee, under the auspicious that, should Receivables not be recoverable, TLF would have assumed such a risk.

29.     However, these representations were false, and were made for the express purpose of inducing Plaintiff into entering into the MCA and Guarantee Agreement. But for Defendant's misrepresentations, Plaintiff would not have entered into the Agreements, and as a result of Defendant's misrepresentations and inducement, Plaintiff suffered damages.

**D. Usury.**

30.     Upon determining that the MCA is a "disguised loan," rather than a true receivables purchase agreement, Plaintiffs seek a declaration that the MCA is unlawfully usurious.

31.     Statutory usury is established when a plaintiff shows that (a) the defendant loaned money to the plaintiff; (b) plaintiff had an absolute obligation to repay the principal; and (c) defendant contracted for, charged, or received interest that exceeded the maximum amount allowed by law.

32.     Under the terms of the MCA, Defendant TLF loaned Roberts Chevrolet $285,000 (based on a principal amount of $300,000); Plaintiff, as guarantor, had an absolute obligation to repay the principal of $300,000; and TLF contracted for the right to recovery of interest totaling $149,700.00 in a period of only fifty (50) days, representing an interest percentage for that period of 50%, or an annual percentage rate of *365%*. This amount of interest exceeds the maximum rate of interest allowed by law. TEX. FIN. CODE § 301.002(a)(17).

**E. Guarantee Agreement as to Susanty Roberts is Unenforceable**

33.     Plaintiff, **SUSANTY ROBERTS** further seeks a declaration that the Guarantee Agreement contained at pp. 13 – 17 of the MCA is unenforceable, as it seeks to impose joint and several liability for repayment of a usurious loan agreement issued to Roberts Chevrolet on Plaintiff Roberts in her individual capacity.

**F. MCA Agreement's Choice-of-Law and Forum / Venue provisions do not apply**

34.     The MCA in this matter contains a "choice of law" provision by which the "Agreement and the relationship between TLF, each Merchant, and each Guarantor w[ould] be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws." (MCA Agreement, ¶ 39). Likewise, the MCA

provides that "any litigation relating to this Agreement or involving TLF on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the State of New York." (MCA Agreement, ¶ 40).

35.    However, as District Courts in New York have held, to the extent that the MCA would be considered usurious under New York law, New York law would likewise consider the MCA *totally* void, rendering not only the commercial terms but also ancillary provisions such as the choice-of-law and venue and forum-selection provisions unenforceable.[2]

36.    Likewise, the forum and venue selection provision language is, on its face, unenforceably broad. Beyond seeking to require disputes involving interpretation of the language or enforcement of the Agreement be brought in New York Courts, the Agreement seeks to require *any litigation* in which TLF is a party on one side and any Guarantor or Merchant is a party on the other also be brought in New York.

### DAMAGES

37.    As a result of TLF's breach of fiduciary duty, fraud, and fraudulent inducement, as well as for usury, Plaintiff sustained damages for which they now sue including, but not limited to, the following:

    a.  Lost revenues.

    b.  Statutory Penalties for violation of TEX. FIN. CODE §§ 305.001, *et seq.*

    c.  Lost account proceeds.

    d.  Other damages permitted by law.

38.    Additionally, Plaintiff seeks declaratory relief in the form of a declaratory judgment finding that:

---

[2]    *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 690 Supp.3d 167, 174 (S.D.N.Y. Aug. 28, 2023)

a. The MCA is a disguised loan agreement;

b. The MCA is usurious; and

c. The Choice of Law and Forum Selection clauses of the MCA are unenforceable.

### ATTORNEY FEES

39.     Plaintiff is entitled to the recovery of their reasonable and necessary attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001; Tex Fin. Code §§ 305.005, 349.001(a)(2). Plaintiff is also entitled to attorney's fees as the court deems just and proper as "further relief" pursuant to 28 U.S.C. § 2202, as state law governs the award of attorney's fees in declaratory judgment actions brought pursuant to diversity jurisdiction.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff, **SUSANTY ROBERTS** pray that Defendant, **TIMELESS FUNDING LLC** be cited and commanded to appear herein and, that upon trial of this matter, Plaintiffs shall recover such damage, declaratory relief, attorney's fees, and other relief to which Plaintiff may show themselves to be justly entitled, at law or in equity.

Signed:                                                        Respectfully submitted

By: _____
    Marcellous S. McZeal
    United States Supreme Court Admission No.: 3036368
    United States Southern District of Texas Admission No.: 21271
    **GREALISH MCZEAL, P.C.**
    700 Louisiana St., 48th Floor
    Houston, Texas 77002
    (713) 255-3234 – Telephone
    (713) 783-2502 – Facsimile
    mmczeal@grealishmczeal.com

    **ATTORNEY FOR PLAINTIFFS**

11